RUTAN, Internal Revenue Collector, v. JOHNSON & JOHNSON.

HEROLD, Internal Revenue Collector, v. SAME.

(Circuit Court of Appeals, Third Circuit. March 15, 1916.)

Nos. 2034–2045.

1. COURTS ⬥406(1)—CIRCUIT COURT OF APPEALS—REVIEW—QUESTIONS OF FACT.

In actions at law, referred to a special master by stipulation of the parties, and heard before the District Judge on exceptions to the master's report, the Circuit Court of Appeals could not weigh the evidence, or reverse findings of fact by the trial judge supported by submissible evidence, as his findings upon disputed facts were like the verdict of a jury and similarly conclusive.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 1103; Dec. Dig. ⬥406(1); Appeal and Error, Cent. Dig. §§ 3385, 3387, 3389, 3392.]

2. INTERNAL REVENUE ⬥38—STAMP TAX—RECOVERY—QUESTIONS OF LAW OR FACT.

In actions to recover amounts paid for revenue stamps affixed to manufactured articles claimed by collectors of internal revenue to be subject to a stamp tax, the question whether the stamps were bought and affixed under duress and constraint was a question of fact.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 83, 84; Dec. Dig. ⬥38.]

3. INTERNAL REVENUE ⬥38—STAMP TAX—RECOVERY—QUESTIONS OF LAW OR FACT.

In such actions, it was a question of fact what matters were presented and determined in similar actions previously brought and tried, and how far the same matters were again presented in the subsequent actions.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 83, 84; Dec. Dig. ⬥38.]

4. JUDGMENT ⬥714(3)—CONCLUSIVENESS—MATTERS CONCLUDED.

Where plaintiff brought 18 actions to recover money paid during different periods for revenue stamps affixed to certain manufactured articles, and 2 of the actions were tried and determined in plaintiff's favor, and the statutory time for appealing from the judgments had expired, the judgments estopped the government from re-examining the same, or essentially the same, questions upon the trial of the other actions.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1240; Dec. Dig. ⬥714(3).]

5. INTERNAL REVENUE ⬥20—STAMP TAX—DRUGS—"COMPOUNDING"—"COMPOUNDED."

War Revenue Act June 13, 1898, c. 448, § 20, 30 Stat. 456, provides, relative to the stamp tax imposed on medicinal proprietary articles and preparations, that no tax shall be imposed upon uncompounded medicinal drugs or chemicals, but that the tax shall apply to all medicinal articles compounded by any formula, published or unpublished, and put up in style or manner similar to that of patent, trade-mark, or proprietary medicines, etc. Held, that powders or tablets derived from the juice of the papaw, without adding anything effective, but simply taking something away, was not "compounded," as what was left was combined by nature, and "compounding" is only possible when two or more substances

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

previously separate are put together by human agency to form some kind of union.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. § 45; Dec. Dig. ⬤⟾20.

For other definitions, see Words and Phrases, First and Second Series, Compound.]

6. APPEAL AND ERROR ⬤⟾1010(1)—REVIEW—QUESTIONS OF FACT.

The trial judge's findings on pure matters of fact, or mixed matters of law and fact, are alike conclusive, when supported by submissible evidence.

·[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3979–3981·; Dec. Dig. ⬤⟾1010(1).]

7. REFERENCE ⬤⟾100(6)—MASTER'S REPORT—HEARING ON EXCEPTIONS.

Actions to recover back amounts paid for revenue stamps affixed to manufactured articles were, after plaintiff's claims had been sustained in several particulars, referred to a special master, or referee, to ascertain the amounts due pursuant to a stipulation by the parties. Defendants objected to parts of the evidence, and, after the master filed his report, filed exceptions, and they were argued before the District Judge. *Held*, that the evidence should be regarded as if taken before the District Judge himself, and on the argument of the exceptions the situation was precisely as if the trial was still going on in open court, and as if the evidence considered by the master were then being offered for the first time before the judge.

[Ed. Note.—For other cases, see Reference, Cent. Dig. §§ 164–167; Dec. Dig. ⬤⟾100(6).]

8. APPEAL AND ERROR ⬤⟾266(2)—RESERVATION OF GROUNDS OF REVIEW—EXCEPTIONS.

In an action referred to a special master pursuant to a stipulation, in which defendants objected to evidence and filed exceptions to the master's report, the court's order confirming the report in effect overruled the objections, and where no exception was taken to this ruling, or to the entry of judgment, the correctness of the ruling was not before the Circuit Court of Appeals.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1555–·1558, 1561; Dec. Dig. ⬤⟾266(2).]

9. INTERNAL REVENUE ⬤⟾20—STAMP TAX—DRUGS.

War Revenue Act June 13, 1898, schedule B, imposed a stamp tax on medicinal preparations, or compositions made and sold, wherein the person making or preparing them has or claims to have any private formula or secret or occult art for making or preparing them, or any exclusive right or title to the making or preparing thereof, or which are prepared or vended under any patent or trade-mark, or which, if prepared by any formula, are held out and recommended to the public as proprietary medicines, or medicinal proprietary articles or preparations, or as remedies or specifics for any disease. Section 20 provides that the tax shall apply to all medicinal articles compounded by any formula, or put up in style or manner similar to that of patent, trade-mark, or proprietary medicines, or advertised as remedies or specifics for any ailment, or as having any special claim to merit, or any peculiar advantage in mode of preparation, quality, use, or effect. *Held*, that the act did not tax all medicinal articles, but merely those that were noncompetitive, such as are intended for selfmedication, and are accompanied with puffing inducements and unreliable statements about diseases, symptoms, etc.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. § 45; Dec. Dig. ⬤⟾20.]

⬤⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the District of New Jersey; Thomas G. Haight, Judge.

Five actions by Johnson & Johnson, a corporation, against William D. Rutan, Collector of Internal Revenue, and eleven actions by the same plaintiff against Herman C. H. Herold, Collector of Internal Revenue. Judgments for plaintiff, and defendants bring error. Affirmed.

John A. Hartpence, Sp. Asst. U. S. Atty., of Jersey City, N. J., for plaintiffs in error.

Archibald Cox, of New York City, for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. In 1900 and 1901, the plaintiff corporation, Johnson & Johnson, brought 18 suits in the Supreme Court of New Jersey to recover money paid during separate periods for stamps affixed to certain manufactured articles that had been taxed under the War Revenue Act of June 13, 1898. Of these suits 6 were against William D. Rutan as collector of internal revenue, and 12 were against his successor, Herman C. H. Herold. The controversy called in question the treasury's construction of certain language in section 20 and in schedule B. The articles in dispute are (1) medicinal plasters, of which we may take belladonna plasters as the type; (2) papoid powders and tablets; and (3) corn and bunion plasters.

Section 20 provides as follows:

"That * * * any person," etc., "that shall make, prepare and sell," etc., "drugs, medicines, preparations, compositions, articles, or things, including perfumery and cosmetics, upon which a tax is imposed by this act, as provided for in schedule B, without affixing thereto an adhesive stamp, * * * shall be guilty of a misdemeanor: * * * Provided, that no * * * tax shall be imposed upon any *uncompounded medicinal drug* or chemical, nor upon any medicine * * * mixed or compounded for any person according to the * * * prescription of any practicing physician, * * * or which may be put up * * * for said person by a druggist * * * selling at retail only.

"The * * * tax provided for in schedule B * * * shall apply to all medicinal articles compounded by any formula, published or unpublished, *which are put up in style or manner similar to that of patent, trade-mark, or proprietary medicine in general, or which are advertised on the package or otherwise as remedies or as specifics for any ailment, or as having any special claim to merit, or to any peculiar advantage in mode of preparation, quality, use, or effect.*"

Schedule B is as follows:

"*Medicinal proprietary articles and preparations:* * * * Upon every packet * * * containing any pills, powders, tinctures, troches or lozenges, syrups, cordials, bitters, anodynes, tonics, *plasters*, liniments, salves, ointments, pastes, drops, waters (except natural spring waters and carbonated natural spring waters), essences, spirits, oils, and *all medicinal preparations or compositions whatsoever, made and sold, or removed for sale, by any person or persons whatever, wherein the person making or preparing the same has or claims to have any private formula, secret, or occult art for the making or preparing the same, or has or claims to have any exclusive right or title to the making or preparing the same, or which are prepared, uttered, vended, or exposed for sale under any letters patent, or trade mark, or which, if prepared*

*by any formula, published or unpublished, are held out or recommended to the public by the makers, venders, or proprietors thereof as proprietary medicines, or medicinal proprietary articles or preparations, or as remedies or specifics for any disease, * * * whatever affecting the human * * * body."*

Under the New Jersey practice, several defenses were specified, in substance as follows:

(1) That the money sued for was paid voluntarily, and was not collected by force or duress or under threat of distraint; on the contrary, the taxes were lawfully assessed and collected.

(2) That all the packages stamped contained medicinal proprietary articles or preparations, compounded according to formulas published or unpublished, and were put up in a style or manner similar to the style or manner used by patent, or trade-mark, or proprietary medicines in general.

(3) That these articles or preparations, thus compounded, were advertised on the packages or otherwise as remedies or specifics for some ailment, or as having special claim to merit, or as having peculiar advantages in mode of preparation, quality, use, or effect.

(4) That the plaintiff claimed to have private formulas, or a secret or occult art, for making or preparing the articles, or to have the exclusive right or title to the making or preparing of the same.

(5) That the articles were prepared, uttered, vended, or exposed for sale, under letters patent or trade-marks, or were held out or recommended to the public by the makers, venders, or proprietors, as proprietary medicines, or as medicinal proprietary articles or preparations, or were held out as remedies or specifics for some disease affecting the human or animal body.

(6) That the articles were compounded drugs or chemicals, or medicinal articles compounded.

(7) That the articles were made by mixing one or more medicinal drugs with a base that had either no medicinal effect or none that was designed or important, and were so mixed according to a private formula, although they were not held out as proprietary, such articles being advertised as having some special claim to merit, or as remedies or specifics for some ailment.

(8) That the articles, or their wrappings, boxes, or packages, bear the plaintiff's trade-mark, and a special style of display, consisting of markings and legends adopted by plaintiff in selling its goods.

The suits were removed from the state court to the federal court, and by consent were tried without a jury. Two of them were heard by Judge Archbald (specially assigned), and were decided in favor of the plaintiff. Johnson v. Rutan (C. C.) 122 Fed. 993; Johnson v. Herold (C. C.) 123 Fed. 409. Writs of error to this court were sued out, but were dismissed, because the statutory time for appeal had passed (Rutan v. Johnson, 130 Fed. 109, 64 C. C. A. 443); the force of the judgments below being therefore undisturbed. Afterwards the remaining 16 cases were tried before the late Judge Cross, who sustained the plaintiff's claims in several particulars. Johnson v. Herold (C. C.) 161 Fed. 593. Pursuant to a stipulation by the parties, the cases were then sent to a special master, or referee, to ascertain the

amounts due. Exceptions to his report were dismissed by Judge Haight (whose hitherto unpublished opinion appears on a subsequent page), and judgments were finally entered for the sums determined by the master.

[1] Since all the cases can be disposed of by deciding three or four questions, we need not take up each writ separately. At the outset, we are confronted by the question: What matters are now subject to review in this court? Certainly we can reverse no finding of fact by the trial judge, if the finding was supported by submissible evidence. It is not within our province to weigh the evidence; his findings are like the verdict of a jury upon disputed facts, and are similarly conclusive in a court of appeal. Fidelity Co. v. Commissioners (C. C. A. 8th) 145 Fed. 150, 76 C. C. A. 114; Oil Co. v. Holcomb (C. C. A. 8th) 212 Fed. 129, 138 C. C. A. 642; Nashville Railway v. Barnum (C. C. A. 2d) 212 Fed. 637, 129 C. C. A. 170; Philadelphia Casualty Co. v. Fechheimer (C. C. A. 6th) 220 Fed. 401, 136 C. C. A. 25; Wear v. Imperial Co. (C. C. A. 6th) 224 Fed. 63, 139 C. C. A. 622; Lupton's Sons v. Automobile Club, 225 U. S. 489, 32 Sup. Ct. 711, 56 L. Ed. 1177, Ann. Cas. 1914A, 699; United States v. Fidelity Co., 236 U. S. 527, 35 Sup. Ct. 298, 59 L. Ed. 696. And, as the assignments of error do not attack any ruling by the District Judge during the trial, no question concerning the correctness of that proceeding is presented on these writs. So far therefore, as the findings of Judge Cross are upon questions of fact, they cannot now be successfully assailed, and a reference to his opinion (161 Fed. 593) will enable us to determine what questions (if any) may still be raised by the government.

[2] In the first place, it is undoubtedly a question of fact whether the stamps were bought and affixed under duress and constraint, and upon this point the third finding is explicit:

"That between the 1st day of July, 1898, and the 1st day of July, 1901, the plaintiff purchased large quantities of internal revenue stamps from the said defendants—purchases made between July 1, 1898, and March 1, 1899, being made from the defendant William D. Rutan, and during the balance of said period from the defendant Herman C. H. Herold. A part of the stamps purchased during the whole period were affixed on the articles mentioned in said declarations and canceled, such stamps being so affixed and canceled under rulings of the said defendants and the Commissioner of Internal Revenue of the United States that such articles were subject to a tax under the provisions of the act referred to, and the sums so paid for said internal revenue stamps by the plaintiff to the defendants were paid under protest and on threat of distress and confiscation in case of refusal and not voluntarily. For the sums thus paid, claims were duly presented by the plaintiff and disallowed."

[3] It is also a question of fact what matters were presented and determined in the first two suits tried before Judge Archbald, and how far such matters were presented again in the 16 suits that were afterwards tried before Judge Cross. Upon this point the seventh and eighth findings are as follows:

"(7) In the actions above mentioned, heretofore litigated and determined between the parties hereto, this court entered final judgment that the plaintiff was entitled to recover the amount paid by the plaintiff to the defendants under the identical circumstances under which payment was made herein, and as part of the same transaction for stamps affixed and canceled upon certain plasters, which in every respect were identical with the plasters involved

in the action now before the court, designated 'Class B,' which actions determined the following questions:

"(a) That the payments were not voluntary.

"(b) That the plaintiff has not and does not claim to have any exclusive right or title to the making or preparing the plasters. That the plasters are not prepared, uttered, vended, or exposed for sale under any letters patent or trade-mark, or held out or recommended to the public by the plaintiff as proprietary medicines, or medicinal proprietary articles or preparations, or as remedies or specifics for any disease, diseases, or affections whatever affecting the human or animal body, or put up in style or manner. similar to that of patent, trade-mark, or proprietary medicines in general, or advertised on the package or otherwise as remedies or specifics for any ailment or as having any special claim to merit or to any peculiar advantage in mode of preparation, quality, use, or effect.

"(c) That the use of plaintiff's trade-mark as it is used on said plasters did not render them liable to taxation.

"(d) That the amount paid as taxes on said articles should be returned to the plaintiff.

"(8) That the following articles, to wit: All the articles in class C. and all the articles in class D, and the capsicum, strengthening, porous, belladonna, and belladonna and capsicum, plasters, in class E, and the belladonna plaster in class H, not designated 'Johnson's'—each and all present no question not actually litigated and determined in the aforesaid actions between the parties hereto."

Clause (c) of paragraph 7 is a mixed finding of law and fact, and clause (d) is a conclusion of law; but the remainder of the two paragraphs contains statements of fact almost wholly. The plasters thus referred to were inclosed in wrappers bearing on the face two small red crosses and the following words:

"Apply heat if not sufficiently adhesive.
If the face cloth adheres too firmly, it can be easily removed by dampening.
B E L L A D O N N A
(cross)                    PLASTER                    (cross)
Prepared by
JOHNSON & JOHNSON,
New Brunswick, N. J., U. S. A.
Guaranteed to contain the full amount of the alkaloids of Belladonna
root required by the Br. P. 1898."

On the back, are the following words in four languages:
"DIRECTIONS FOR USE.

"The part to which the plaster is to be applied should be dry and clean.

"The cloth on the face of the plaster should be removed by pulling it quickly. Having applied the plaster, rub it until it conforms perfectly to the skin.

"If the cloth, on the adhesive side of the plaster, should adhere too firmly, it can be easily removed by dampening, in which case the plaster should be wiped dry before applying.

"*To Remove the Plaster.*—After loosening one corner take firm hold and take off the plaster by a succession of quick jerks. Do not attempt to remove it by pulling steadily. A plaster should not be worn longer than necessary to produce the desired effect."

The other findings that are now relevant are Nos. 10, 12, and 14:

"(10) The following articles are each and all purely mechanical in their purpose and operation and are not medicinal articles or preparations: Finger hats; Dr. Don's corn plasters; Dr. Don's bunion plasters."

"(12) That 'Papoid Powder' and 'Papoid Tablets,' in class G, are the simple drug papain, the purified juice of the carica papaya (alone and with an excipient, which is purely mechanical and not medicinal, respectively), and are uncompounded drugs."

"(14) That, with the exception of the articles mentioned in findings 5 and 9 as withdrawn, in finding 6 [should be 10] as mechanical and not medicinal, and the 'Rheumatic Plaster' in class E, and that 'Belladonna Plaster' in class H which bears the word 'Johnson's,' and the papain preparations in class G, all the articles involved in these actions are in fact:

"(a) Not plasters wherein the person making or preparing the same has or claims to have any private formula, secret or occult art, for the making or preparing the same, or has or claims to have an exclusive right or title to the making or preparing the same. On the contrary, they are manufactured and prepared according to formulas taken from the United States or National Dispensatory or the British Pharmacœpia, all well-known publications of accepted authority, and are standard medical preparations recognized and constantly prescribed by the medical profession, the merits of which are discussed in medical text-books and journals, and are the same plasters made according to the same formulas as prepared and sold under the same name by other manufacturers in competition with the plaintiff.

"(b) They are not prepared, uttered, vended, or exposed for sale, under any letters patent or trade-mark, or held out or recommended to the public by the plaintiff as proprietary medicines or medicinal proprietary articles or preparations, or as remedies or specifics for any disease, diseases, or affections whatever affecting the human or animal body, or put up in style or manner similar to that of patent, trade-mark, or proprietary medicines in general, or advertised as remedies or specifics for any ailment, or as having any special claim to merit or to any particular advantage in mode of preparation, quality, use, or effect. On the contrary, they are sold under the standard Pharmacœpia names, which are the equivalents of formulas, and the names used by the text-books and the medical profession and other manufacturers to describe the same plasters by whomsoever produced, and they are represented to be nothing except the standard remedies they in fact are."

[4, 5] It is unnecessary to cite authorities for the proposition that the judgments in the two cases before Judge Archbald operated by way of estoppel to prevent the government from re-examining in the present suits the same, or essentially the same, questions that he had previously decided. This covers the class of articles to which the belladonna plasters belong, but does not embrace the papoid preparations, or the corn and bunion plasters. About the last-named preparations and plasters, however, there is scarcely any dispute. Even if the tenth and twelfth findings were open to question now, little doubt can exist that the plasters do not act medicinally (in the sense used by the act), but only mechanically, and as little doubt, we think, that papoid is not "compounded." Nature combines the constituents in the juice of the papaw, and papoid is derived from the juice, not by adding anything effective, but simply by taking something away. What is left, and is sold in the form of powder or tablet, is what nature combined; man having had nothing to do with the process. Compounding (as the act uses the word) is only possible when two or more substances, previously separate, are put together by human agency to form some kind of union, and no such union has been brought about to produce the substance in question.

[6] There may perhaps be some room to question how far paragraph 14 is confined to pure findings of fact. It may contain mixed findings of law and fact, and perhaps (to some extent) conclusions of law. But we see no need to analyze the paragraph minutely, for, whether it states pure matters of fact or embraces mixed matters of law and fact, these are alike conclusive in this court. In the language

of Fidelity Co. v. Commissioners (C. C. A. 8th) 145 Fed. 151, 76 C. C. A. 115:

"The verdict of a jury concludes all issues of fact, and of mixed law and fact, save those questions of law which have been reserved for review by demurrer, motion, request, or exception. A finding of the court without a jury has the same effect, with the single exception that when the finding is special the question whether the facts found sustained the judgment is open to review. In the trial of an action by the court without a jury, the rulings of the court in the progress of the trial, and those only, are open to review. The true test for determining whether or not a question or ruling in a trial by the court without a jury is reviewable is the answer to the question whether or not it would have been open to review if the trial had been to a jury."

Nearly every verdict is unavoidably a mixed finding of law and fact. The court gives instruction concerning the legal rules that apply to the controversy, and after the jury have decided disputes about the facts they take up the facts thus found, consider them in the light of the rules, and decide what consequences are properly to follow. The verdict announces the result, and in this both elements are usually combined. Essentially a like course is pursued when the judge is trying the case alone. He finds the facts and applies the rules of law thereto, and in the end comes to a conclusion in favor of one party or the other. And—with the proviso that submissible evidence of the facts found must always be present—it makes no difference whether his findings of fact are implicit in his conclusion, or explicitly set forth. In either event he passes on the evidence, finds the facts, and applies the law thereto; his conclusion being no more subject to attack than is the verdict of a jury. If, however, we should be mistaken in believing that no question of law is now presented by these cases, we shall only add that we are in accord with the views expressed by Judge Archbald and by Judge Cross upon the construction and applicability of the statute, and need not repeat what they have already said.

[7-9] This leaves for consideration only one question, namely, the correctness of the report made by the special master. It is clear that the evidence taken before him should be regarded in the same light as if it had been taken before the district judge himself. Ordinarily, the parties would have been obliged to offer it before the judge; but, considering the extent and complication of the inquiry, counsel and judge alike recognized the convenience, if not, indeed, the practical necessity, of referring the matter to a master for a more leisurely and a more prolonged examination. After the master filed his report, the defendants filed exceptions thereto, and these were argued before Judge Haight. The situation then was precisely as if the trial had still been going on in open court, and as if the evidence that the master had considered were being offered for the first time before the judge. Important parts of this evidence had been objected to before the master as incompetent and inadmissible, and these objections were now repeated to the judge for his independent ruling thereon. Giving his reasons (reported in the margin),[1] Judge Haight overruled the objections and admitted the evidence; for this is the effect of his order con-

[1] See note at end of case.

firming the report of the master, which was in large part founded on the evidence attacked. Now, to this ruling by the court the defendants took no exception—and indeed, so far as we can discover, neither did they except to the entry of judgment—and we are therefore of opinion that the correctness of the ruling is not before us. Accordingly we shall not discuss it, but shall conclude this discussion by stating our agreement with the position taken by the plaintiff's counsel to the following effect:

Congress did not tax all medicinal articles, but merely those that were noncompetitive, in order that the tax should fall on the manufacturer. And as such articles are also intended for selfmedication, and are always accompanied with "puffing" inducements, and unreliable statements about diseases, symptoms, etc., they harm the public on the whole, and for this reason have been for many years, and were then, regarded as a proper object of taxation. The department was no doubt overwhelmed by the effort to decide what articles were taxable, and could scarcely avoid making occasional mistakes, and thereby taxing some standard, competitive, medicinal preparations. Among these we think the articles in question are properly to be included.

In each case the judgment is affirmed.

NOTE.—The following is the opinion of Haight, District Judge, referred to in the opinion:

HAIGHT, District Judge. Several suits were instituted by Johnson & Johnson against William D. Rutan and Herman C. H. Herold, respectively, collectors of internal revenue, to recover certain moneys which the plaintiff was compelled to pay under the War Revenue Act of June 13, 1898. The money was paid for stamps, which were affixed to various products manufactured by the plaintiff from July 1, 1898, to July 1, 1901. The plaintiff claimed that certain of the products which had thus been subjected to the stamp tax were not taxable within the act, and that it was entitled to have the moneys, so paid, refunded. The case was heard by the court without a jury, and as to certain products the plaintiff's contention was upheld. It was then referred to a referee, to ascertain and report the amount which the plaintiff was entitled to have returned to it in each case. The referee made his report, to which exceptions have been filed. The exceptions relate only to the admissibility and legality of certain of the evidence upon which the referee's report is based.

At the beginning of the hearings before the referee counsel entered into the following stipulation:

"Subject to the proper authentication of books, Exhibits P2, P3, and P4 for Identification as evidence, and also to the accuracy of the statements contained therein, it is stipulated that they show the manufactured goods on hand, and the goods manufactured by the plaintiff as tabulated by the witness, Mr. Porter, during the period stated by him in Exhibit P1 for Identification."

Mr. Porter was an employé of the government, who examined the books of the plaintiff prior to the hearing before the referee, and made a tabulation therefrom, showing the amount of moneys paid by the plaintiff as taxes on products, which the court had determined were not taxable, and which are therefore the amounts to be refunded. The amounts reported by the referee are those found by Mr. Porter. No question is raised as to the correctness of the tabulations, providing the books and data from which they were made have been properly authenticated to be admissible in evidence.

The only question, therefore, to be considered at this time, is whether the books and data from which Mr. Porter made his calculations have been properly authenticated. Whether they were admissible as independent evidence of the facts therein contained does not, in view of the stipulation, seem to be open to question.

The plaintiff, in order to establish the amounts paid, as no independent memoranda of that was kept, was first compelled to show the quantity of the various kinds of products, which the court held were not liable to tax, manufactured by it during the period before mentioned. Some of these were, however, exported, and no tax was paid on them, and some were on hand at the time the act was repealed. As to the latter, the government had, before the suits were instituted refunded the amount paid on them. As to certain products, it was also necessary to show the amount thereof which the plaintiff had on hand at the time the act went into effect. After deducting from the total amounts of the various kinds of products on hand at the beginning of the tax period, and those manufactured during the time that the act was in force, the amounts exported and the amounts on hand at the time the act was repealed, there was ascertained the quantity of goods upon which the taxes had been improperly paid. To ascertain the amount so paid, it was only necessary to multiply the number of packages of each kind by the denomination of the stamps affixed to each, respectively. Two books contained a record of the products manufactured during the tax period, and for some time before and after. The plaintiff's course of business in making this record was as follows: When the goods were completed, they were examined by inspectors, both to see that they were ready to be sent out and that they were properly stamped. After they had been inspected they were packed by the inspectors and sent to the shipping department, whence they were distributed. The inspectors counted them, and noted the amounts of each article upon temporary sheets of paper, which were then copied in the books in question; the temporary sheets being then destroyed. These books were those from which the government inspector made part of his tabulation. These books were authenticated in the following manner: The inspectors who counted and examined the articles, and who made the entries in the books (being the same persons), were called and testified that the entries were correctly taken from the slips, and that the slips contained the actual counts, which they, respectively, knew to be correct. There would seem to be no doubt but that these books were properly authenticated, so as to make their entries binding upon the parties, within the stipulation before referred to. But, irrespective of the stipulation, they could have been properly used by the respective witnesses to refresh their recollections. In fact, verified as they were, they were admissible, by the great weight of authority, in evidence as independent proof of the facts entered therein. Insurance Co. v. Weide, 9 Wall. 677, 19 L. Ed. 810; Insurance Co. v. Weide, 14 Wall. 375, 20 L. Ed. 894; Reyburn v. Queen City Savings Bank & Trust Co., 171 Fed. 609, 96 C. C. A. 373 (C. C. A. 3d Cir.); Wigmore on Evidence, vol. 1, § 754. The opinion of the Supreme Court in Bates v. Preble, 151 U. S. 149, 14 Sup. Ct. 277, 38 L. Ed. 106 (which is criticized in a footnote of the above-mentioned section of Wigmore), is not at all opposed to this, because the entries were made in the regular course of business, and were not independent memoranda such as the court stated, in that case, to be inadmissible as evidence.

The doctrine regarding the admissibility of regular entries made in the usual course of business, as I understand it, is generally confined in its application to cases where the entrant is unavailable. Wigmore on Evidence, vol. 2, § 1521. When the person who made the entries is available, then, upon verification of the entries by that person, they may become admissible, under the doctrine, broadly stated, of memoranda used to refresh a witness' past recollection. See Wigmore, § 1538, vol. 2. But, however this may be, the Supreme Court, in Bates v. Preble, supra, recognized that the entries, if made in the regular course of business, would be admissible, if properly verified. Nor are the books subject to the criticism that the entries were not made at or near the time when the events which they recorded were taking place, because the witnesses who made the entries also made the slips from which the entries were made. The slips were made at the very time that the articles were counted and were recorded in the book shortly thereafter. Both the slips and the books were testified, by the respective witnesses who made them, to be correct. It would appear, from the cases cited by counsel for the defendant, that they considered the books inadmissible, under the so-called "shopbook rule," the application of which is limited to the proof of the sale and delivery

of goods and the performance of work and services. The books were not admissible under that theory, but because they were records of past recollections of the witnesses who verified them. The question whether the stamps affixed to the goods manufactured, as shown in the two books before mentioned, were of the same denominations as figured by Mr. Porter in making his tabulations, does not seem to be within any of the exceptions filed, nor has it been the subject of argument. It is sufficient to say that those who made the entries in the books testified that each article therein recorded was stamped in accordance with a list prepared by one of the officers of the company, which list was, in turn, used by Mr. Porter in making his tabulation.

As to the suggestions that the two books mentioned may be inadmissible, because the witnesses who testified as to the accuracy thereof may have been away on short vacations, and, consequently, during these periods, may not have had personal knowledge of the facts which the entries purport to record, it is to be observed that it is clear that they made the entries in the books and that they were made in the regular course of business, presumably from slips furnished by those whose duty is was, during the absence of the witnesses, to make the counts, and that the entries so made were correct transcriptions of the slips. Under these circumstances, I think the books, as respects the time when the witnesses who made the entries were on vacations, were admissible under the general doctrine pertaining to the regular entries made in the ordinary course of business. Although the persons who had the actual knowledge were not shown to be actually unavailable, I think that, as far as this circuit is concerned, they were admissible under the principle recognized by the Circuit Court of Appeals in Reyburn v. Queen City Savings Bank & Trust Co., supra, and stated in Wigmore on Evidence, § 1521.

The inventory of the goods on hand at the beginning of the taxing period I consider to have been properly authenticated and to have been admissible in evidence independently of the stipulation. It appears that the clerks, under the direction of one witness, counted the goods and noted the results on slips which were handed to the witness. These he verified in a general way, in many instances checking them up by counting the goods himself. The figures upon the slips were then transcribed by him upon inventory sheets. Another witness testified that he copied the figures from the inventory slips in the exhibit which was offered in evidence. The original sheets were destroyed. The only way in which this inventory could have been proven more conclusively was by calling all the various clerks who had counted the goods in the bins. This was not necessary. Mississippi River Logging v. Robson, 69 Fed. 773, 16 C. C. A. 400. The case can properly be supported on the general doctrine pertaining to regular entries made in the usual course of business, on the theory that the persons who had the actual knowledge of the facts upon which the entries were based, were unavailable on grounds of mercantile inconvenience. Sections 1521 and 1530 of Wigmore on Evid. vol. 2. The same general doctrine of admitting so-called shop-books where the entries have been made by the bookkeeper, upon reports made to him in the ordinary course of business by workmen, is recognized in Corkran v. Rutter, 76 N. J. Law, 375, 69 Atl. 954. No question is raised as to the correctness of the inventory of goods on hand at the end of the tax period. In fact, the government had already refunded the taxes paid on those goods. The only remaining question is that pertaining to the data from which the amount of goods, which were exported during the tax period, was obtained. It appears that the list of exports furnished to Mr. Porter was taken from the summaries of exports sent from time to time to the government revenue officers, in accordance with the regulations of the department. An invoice was made out for each shipment and was sent to the government revenue officers, in whose care the goods themselves were shipped. Letter press copies of the invoices were kept and monthly summaries thereof were made and also sent to the collector. The list given to Mr. Porter was taken from the summaries sent to the collector and was verified as to its correctness in that respect. The original invoices and summaries received by the collector had been destroyed. The copies of the invoices, as well as the copies of the summaries, were offered. No objection was ever made by the government as to the correctness of the original invoices and summaries. Under these circumstances, I think that the

government would be estopped to deny that the original invoices and summaries, as furnished to them pursuant to departmental regulations, correctly showed the goods which were exported. As the original invoices and summaries have been destroyed, copies, under familiar rules, are admissible. Such copies, proven to be such, were offered and admitted. There is a slight discrepancy between the tabulations taken from the copies of the invoices and those taken from the summaries. This may be explained by the condition of some of the copies of the invoices. I think that the amounts which would have been payable on the exported goods, and which, therefore, must be deducted from the amounts figured to be the taxes on all the goods manufactured and on hand, was properly ascertained from data which was legal evidence. It also appears from the referee's report that in three cases the amount found to be due to the plaintiff exceeds the amount set forth in the declaration. A motion was made that the plaintiff be permitted to amend the declaration so as to recover these additional amounts. I see no reason why such an amendment should not be made, and it will, accordingly, be so ordered.

The referee's report will be confirmed, and there will be a judgment for the plaintiff in each of the cases for the amount found by the referee to be due in each case, respectively.